GENERAL ELECTRIC CO. v. WISE.

(Circuit Court, N. D. New York. January 17, 1903.)

**1. PATENTS—INJUNCTION AGAINST INFRINGEMENT—DEFENSES.**

That a defendant is able to respond in damages is no defense to an application for an injunction against infringement of a patent. If the patent is valid, the owner has the absolute right to be protected in the exclusive use of the invention which the law secures to him during the term of the patent.

**2. SAME—VIOLATION OF ANTI-TRUST LAW.**

That a complainant is a member of a combination in violation of the anti-trust law of July 2, 1890 [U. S. Comp. St. 1901, p. 3200], does not give third persons the right to infringe a patent of which complainant is owner, nor preclude complainant from maintaining a suit in equity to enjoin such infringement.

**3. SAME—ANTICIPATION—PRIOR UNSUCCESSFUL DEVICES.**

A patent for an invention which successfully accomplishes a useful result is not void, for anticipation or prior use, because of a prior device, however similar in combination or close in resemblance to that of the patent, where such prior device was not operative, and failed to produce the result sought, and which is produced by the device of the patent.

**4. SAME—INFRINGEMENT—INCANDESCENT LAMP SOCKET.**

The device of the Tournier patent, No. 559,232, for an incandescent lamp socket, was not anticipated by either the Weston socket or the Westinghouse push button socket, both of which failed to accomplish the result sought, and attained by the device of the patent. Claims 1, 2, 3, and 4 construed, and *held* valid and infringed, on a motion for a preliminary injunction.

In Equity. This is a motion in the above-entitled cause for a preliminary injunction restraining the defendant, his agents and servants, from manufacturing and selling certain electrical apparatus (sockets for incandescent lamps) alleged to be an infringement of the Tournier patent (letters patent No. 559,232), particularly claims 1, 2, 3, and 4 thereof,—a structure or invention alleged to be indispensable in the art of electric lighting.

Samuel Owen Edmonds, for complainant.

Alfred Wilkinson (William Kernan, of counsel), for defendant.

RAY, District Judge. The complainant's claim is: That prior to April 28, 1896, Julius C. Tournier, a citizen of the state of New York, residing at Schenectady, was the original, first, and sole inventor of certain new and useful improvements in sockets for incandescent lamps, fully described in the letters patent, No. 559,232, and which had not been used by others in this country before his invention or discovery thereof, and which had not been abandoned or patented or described in any printed publication in this or any foreign country before his invention or discovery thereof, or more than two years prior to his application for said letters patent, and which were not, prior to his said application, in public use or on sale in this or any other country for more than two years. That all lawful conditions having been complied with, on the 28th day of April, 1896, letters patent, in due form, were duly issued therefor to the said Tournier;

¶ 1. See Patents, vol. 38, Cent. Dig. § 495.

complainant, General Electric Company, being the assignee of said Tournier. That by virtue of such patent and assignment the complainant became and is vested with and possessed of the full and entire right, title, and interest in and to said letters patent, and all rights thereunder, and was in the full possession and enjoyment of same up to February, 1899. That the complainant is a large manufacturing company, engaged in manufacturing and putting sockets for incandescent lamps, employing and containing such invention, on the market and in the trade, and that same are being generally used, and that such sockets so made, sold, and delivered have been duly marked "Patented," and that complainant has invested large capital in the business, and been to great expense and trouble in' establishing the business, and that such sockets are in great demand, and complainant will reap great benefits if the alleged infringement by the defendant is enjoined, and suffer great loss if an injunction is not granted. That in the spring of 1899, the Anchor Electric Company undertook to and did infringe said letters patent. That this complainant brought suit against said company for said infringement in the United States circuit court for the Southern district of New York, and that an answer was filed alleging the invalidity of said patent by reason of anticipation in the prior art, and that the production of such structure did not involve the exercise of invention, and also denying that the sockets made and sold by said Anchor Electric Company constituted an infringement. That proofs were taken, the action tried and duly submitted, and a decree duly made and entered fully establishing the validity of such patent. The final decree was made January 24, 1902. Another suit and decree of similar or the same import against New England Electric Company are also alleged. It is then alleged that the defendant, well knowing all such facts, without license or allowance and against the will of the complainant, has made and sold, and is making and selling, or causing to be made, used, and sold, sockets for incandescent lamps, employing and containing the said invention, and particularly those set forth in claims 1, 2, 3, and 4 of said letters patent, and is threatening to continue such infringement; that said defendant has been notified of such infringement; and that his continuance of such acts encourage others to infringe likewise.

The defendant claims that this invention was old,—prior invention,—and relies on the Weston socket and the Westinghouse push button socket, and says he has not infringed, and that his block differs more from Tournier's than Tournier's does from Weston's. The defendant then alleges that the complainant does not come into court with "clean hands"; that it and all other important socket manufacturers in the country organized an illegal association three or more years ago, by the terms of which they bound themselves to raise the price of sockets, and not to sell at a lower price than agreed, in direct opposition to the anti-trust law of July 2, 1890. (26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]). By implication, rather than directly, it charges collusion between the complainant and Anchor Electric Company in the action referred to, and finally says no injunction should be granted, because the defendant is a leading manufacturer of Watertown, N. Y., amply able to respond in damages, and that the com-

plainant should resort to that remedy even if this court finds an infringement.

No time will be used in answering this suggestion, except to say that, if the complainant's letters patent are valid, it is entitled to protection by injunction against all the world. No other person or company can use its property of this description without its consent, and relegate it to an action for damages. If this patent is valid, the complainant has the absolute right, under the laws of our country, to the use of the patent, and to designate the parties upon whom it will confer the right to use it. Again, in such a case, an action for damages does not afford an ample or a full and complete remedy. Such a remedy is inadequate. In a sense, the granting of a patent confers a monopoly on the inventor or owner of such patent, but such a monopoly is granted in the interest of the public as well as of the grantee of the patent, and is an encouragement to the development of inventive skill and genius. The patent laws of the United States, while sometimes abused or perverted, have had much to do with the growth and prosperity of our country, and have added much to our material and intellectual development. Ultimately, these inventions are surrendered to the public, and it is only just that for a time the inventor reap the rewards of study and industry. Grant v. Raymond, 6 Pet. 218, 241, 8 L. Ed. 376; Bement v. Harrow Co., 186 U. S. 88, 89, 22 Sup. Ct. 747, 46 L. Ed. 1058. The cry of monopoly, therefore, has no place in the discussion of the question of infringement or priority of invention. It is difficult to understand how or why a violation of the Sherman anti-trust law by this complainant, if there has been such a violation, confers any right on the defendant to infringe this patent. That act points out the penalties for its violation, and it is not understood that such law denies the grantees of patents the protection of the law because they may be violating some statute. However that may be the evidence falls far short of establishing such a violation by this complainant. The testimony on that subject is squarely contradicted. An individual cannot confiscate the property or property right of a corporation on the ground it has violated that act. Soda Fountain Co. v. Green (C. C.) 69 Fed. 333; Columbia Wire Co. v. Freeman Wire Co. (C. C.) 71 Fed. 302; Bement v. Harrow Co., 186 U. S. 70, 88–91, 22 Sup. Ct. 747, 46 L. Ed. 1058. Harrow Co. v. Quick (C. C.) 67 Fed. 131, cannot be accepted as authority on this question.

We come then to the consideration of the questions whether this Tournier patent, No. 559,232, issued April 28, 1896, is a new and valid invention, and whether the defendant has infringed and is infringing same.

Claims 1, 2, 3, and 4 of the said patent, now particularly in question, are as follows:

"(1) In an incandescent lamp socket, an insulating block, circuit terminals, and a circuit-controlling key, with a metallic tip and operating spring mounted thereon, in combination with a metallic socket mounted on the insulating block; the metallic tip of the controlling key being adapted to make contact with the shell and close the circuit.

"(2) In an incandescent lamp socket, as a new article of manufacture, an insulating block, formed with passages in its edges for the circuit wires, a

transverse passageway for the insertion of a controlling circuit key shaft, its bearings, and a controlling spring, a cavity at one end for the location of a rotary metallic tip of the key shaft, and a cavity at the other end for the location of one of the binding screws and brackets, a cavity at one side of the block for the location of the other binding screw and bracket, and a contact arm as herein set forth.

"(3) In an incandescent lamp socket, an insulating block, formed with a transverse cavity, a rotary circuit-controlling key, and a spring and contact tip located in this cavity, binding screws located in cavities in the insulating block, one connected with the key shaft and the other with a metallic contact arm projecting over the top of the block, and a shell or socket mounted on the top of a block, and adapted to complete the circuit with a lamp by contact of the contact tip therewith.

"(4) In a socket for incandescent lamps, the combination with the insulating base thereof and a key having a contact tip of a lamp-socket cylindrical shell mounted on one end of said base, and so arranged in relation to the key tip that the latter contacts with the lamp-socket cylindrical shell to close the circuit, as set forth."

In General Electric Co. v. Anchor Electric Co. (and Henry G. Issertel as agent and manager of said company), reported (C. C.) 106 Fed. 503, the validity of this patent,—particularly of claims 1, 2, 3, and 4, above quoted, and also claim 9, was directly in issue; and it was held by Shipman, Circuit Judge, after full and careful consideration:

"The Tournier patent, No. 559,232, for a socket for incandescent lamps, the base of which consists of a substantial block of porcelain or other insulating material, in which the contact key and circuit terminals are incased, covers a device which, as a complete structure, was not anticipated, and, in view of its immediate general adoption and commercial success, cannot be denied patentable invention. Claims 1, 2, 3, and 4 construed, and held infringed. Claim 9, which is limited to an insulating ring, used between the outer shell and the socket, held void for lack of invention, in view of the prior art."

In that decision, as far as it covers the precise questions now presented, this court fully concurs. It is not necessary to travel over the same ground, and present the same facts and reasoning in different language. But the respondent here, James B. Wise, as he alleges, raises new questions, and presents new evidence, upon which this court is asked to find and hold that this invention, covered by the claims quoted, was anticipated and not patentable, and, failing here, claims the defendant's socket is as much or more a new invention as the complainant's, and that same is so widely different as not to constitute an infringement. The defendant says:

"We oppose this motion on new evidence of the highest importance, and offer entirely new defenses: First. On the Weston socket, having a cylindrical block of insulation, identical in every essential with Tournier's, for it has the transverse passageway, the outside cavities, and the wire grooves or passages in its edges. Second. On the Westinghouse push button socket, in public use and on sale in 1893 and before, which shows a porcelain block of similar construction, having a transverse passageway to receive and to protect the switch mechanism."

It is not discovered from the record that Judge Shipman had these two sockets, or a description of them, before him when he passed on the question of anticipation or prior invention and use. This alleged new evidence will be considered on the theory that it was not presented to the court on the trial of the Anchor Electric Co. Case, and might have changed the result there, and may change the result here from

what it necessarily would be, should this court follow the decision of Judge Shipman.

Two or more persons may use the same material, existing in precisely or substantially the same form, experimenting and making combinations, and having in mind the construction of a new and a useful invention that will produce a given result. The one or ones who fail invent nothing, but the one who succeeds may have invented a patentable thing; and, if a patent is granted, he is entitled to its protection and benefits. Those who failed, or others, cannot, by taking the same materials and making substantially the same combinations, varying the form or arrangement, or both, in nonessentials, but aiming at and producing the same results, claim either priority of invention, prior use, or new invention. Such facts will not defend the charge of infringement. And even if in such experimentation certain imperfect results were obtained, that fact does not establish priority of invention. "If the patented invention is not operative, it cannot be infringed by one that is." Royer v. Coupe (C. C.) 29 Fed. 358, 39 O. G. 239. It would seem to follow that however close the resemblance between some prior alleged invention, even when put in actual use, and the patented invention, if such alleged prior invention was not operative, and failed to produce the beneficial results sought and produced by the patent, it could not constitute prior invention. In such case the patented invention cannot be regarded as old.

In General Electric Co. v. Anchor Electric Co., supra, Judge Shipman says:

"The insulating block of the patent, as constructed and arranged to become the receptacle of the various metallic parts, was a novelty, and in its peculiar characteristics it had no predecessor."

It is now insisted that the Weston socket and the Westinghouse push button socket are each substantially identical with the Tournier socket, and that therefore the Tournier insulating block had not one, but two, predecessors. A careful examination of both, and a comparison of the Tournier block with the Weston block, not only fail to disclose identity, but even similarity, when we consider the purposes for which devised, and the ends to be accomplished. Both are, in general form, cylindrical. Each has a transverse passageway, but these are neither identical, nor, mechanically speaking, similar. The differences in the two are marked and well defined, and absolutely essential differences. They are so marked that it does not occur to the observer that the designer of the Tournier block had the Weston block before him, or in mind, when planning his. In the Tournier block the transverse passageway gives neither ingress on the one side, nor egress on the other, to its full depth. At one side this passageway is so widened as to form a chamber on either side of the main passageway, while at the other side a part of the block is entirely cut away for about one-third the diameter of the block, and to a depth within one-eighth or one-fourth of an inch from the bottom of the transverse passageway. Upon one side a recess is cut, which reaches to within about one-eighth of an inch of the passage referred to. There are other peculiarities, not necessary to describe, but all these peculiarities have their necessary uses in the assembled socket. In the Weston

block, which was of wood, the transverse passageway extends from circumference to circumference unbroken, is much wider, is of uniform width from circumference to circumference and of uniform depth, giving ingress and egress to its full depth, and on one side is cut through to the bottom. Upon the outside of the cylinder we find no less than eight grooves and recesses vertical and diagonal for the arrangement and application of the electrical appliances, none of which are found in the Tournier block. When we come to consider the mode of using these blocks, the ideas of means of application and use, and the results, we find that the functions are not the same, the modes of operation are radically unlike, the results not the same, and the ideas of means for the accomplishment of satisfactory results are radically different, or at least radically defective, in the assembled Weston socket. The Weston socket was not satisfactory or even safe. The Tournier device was carefully and skillfully wrought out by a change in the character of the insulating base, as well as by the modes of working the same, and also in many minor details and appliances, all brought into harmony and harmonious action, and producing satisfactory results, at which many had aimed, but which all had failed to accomplish. It is impossible to find that the Weston socket was, in a legal sense, as applied in these cases, the predecessor of the Tournier socket.

Coming to the consideration of the Westinghouse push button socket, we find far less resemblance and similarity. It is not necessary to go into detail. In both the Star and Weston sockets, the metallic switch mechanism, which is in the circuit where the current of electricity is being fed to the lamp, is arranged in a cavity or a passageway on the underside of the block, and consequently there is no solid insulation between these electrified parts and the metallic supporting cap of the socket. The result of this, or one result, is the tendency to short-circuiting and burning out, and the resulting fire hazard. In the Tournier socket, the metallic switch mechanism is arranged in a passageway on the upper side of the block, and we have a solid wall of insulation interposed between these electrified parts and the supporting cap of the socket. Short-circuits and burning out are thus precluded between such parts and the cap. In the Tournier socket, we find the contact key and circuit terminals encased within the base, and accidental contact with the exterior metallic shell is thus prevented. In the Weston socket, one of the terminals—one of the parallel contact strips on the block (and this corresponds to the screw shell element)—is always in the circuit and electrified, whether the lamp is in place and the current turned on or not. Here is found, again, the evil of short-circuiting, with outside metallic bodies, and also a liability to accidental shock when handling the socket and when replacing or removing the lamp. With the Tournier socket, all this is remedied, as the situation is the reverse. Again, in the Tournier structure we find the threaded shell disconnected from the circuit except when the lamp is in place or the key closed. To bring about these results, necessary to the success of the art, required inventive skill. The Tournier structure accomplished what all others had failed to bring about, by new ideas of means, by the use of new means, or, to some

extent, old appliances improved, applied, and combined in a new and an effective and beneficial way.

We come, then, to consider the alleged infringement. Each and every essential element of the Tournier patent, as described or mentioned in the claims quoted, or its exact equivalent, is used by the defendant in what we will term the "Wise Socket." Placing the various appliances, making up the assembled sockets, side by side, and then taking the assembled sockets as a whole, we find that there is no substantial difference, except in the mere form of two or three of the parts. In short, the Wise socket is a copy of the Tournier. The compared sockets perform the same functions by the same modes of operation. The effects are the same; the modes of operation are the same, substantially; and the same is true of the means employed. In some respects we find variations in size, shape, and arrangement, but these are evidently studied, not for the sake of improvement, but to avoid the charge of infringement. The socket of the Anchor Electric Co. held to be an infringement, and therefore enjoined (106 Fed. 503), differs but slightly from the Wise socket, here in question. The defendant here, in some respects, has varied from the Anchor Electric and New England infringements, but in so doing has made the similarity of his socket to the Tournier patent the more apparent. In some respects he has varied the form of the insulating block by changing the location, size, and shape of certain cavities and grooves; but all these changes are immaterial, as they do not change the principles of operation, the means, or the results, and the claims of the Tournier patent (referred to and here in question) do not confine the complainant to any precise form or size. The combinations in the assembled socket do not present any substantially different combination. As stated, the combinations are substantially identical. So far as there has been a substitution of elements, they were well-known equivalents. The defendant has produced this Wise socket extensively and secretly. He claims the right to continue its manufacture and sale. Unless enjoined, he will do this, and most seriously injure the complainant. This injury cannot be measured satisfactorily by any judgment for damages, even if the defendant shall be found responsible at the end of the protracted litigations sure to follow a denial of this application.

The conclusion is that, until the trial and determination of this action, the defendant should be enjoined as prayed. It is so ordered.